PATRICK J. COYNE *vs.* COASTWISE DREDGING COMPANY.

MARCH 25, 1914.

PRESENT: Johnson, C. J., Parkhurst, Sweetland, Vincent, and Baker, JJ.

*(1)  Master and Servant.  Fellow Servant.*

Plaintiff, a blacksmith's helper, by direction of his employer was engaged in repairing for defendant an iron bucket to its dredger, which bucket attached by chains to a boom had been placed by defendant upon a pile of coal on the deck of a scow which was moored alongside, and rested upon the bottom edges of its jaws, which edges were a few inches apart. Plaintiff, while standing inside the bucket and holding a hot rivet in place, to assist him in pressing upon the rivet, owing to the smooth inside surface of the bucket placed one foot on the side of the bucket and the other between the edges of the jaws at the bottom. While in this position the superintendent of defendant caused the boom to swing and caught plaintiff's foot between the edges of the jaws.

From the necessities of the situation and by direction of defendant, its employees operating the dredging machinery while the repair work was being done, were placed under the limited control of plaintiff's master.

*Held*, that defendant's superintendent at the time of the accident was not a fellow servant of plaintiff.

*(2)  Master and Servant.  Fellow Servant.*

The test for the purpose of determining whether a limited control over a servant in the general service of another, effects a transfer of such employee

from the service of his general master to that of the person exercising control, is, whose is the work which the servant is performing and hence who is really in the control of the servant. In the person whose affairs are being conducted is the real control, although for convenience the authority to give general directions may be conferred upon another.

(*3*)   *Master and Servant.   Fellow Servant.*

In the case at bar evidence considered and held, that defendant was the only one that could move the bucket, if in the course of the repair work it became necessary to do so, and was loaning the work of its machinery and workmen, but not the workmen themselves for the enterprise in which both it and the master of plaintiff were jointly interested.

*Held, further,* that it being a part of the 'arrangement that defendant should render such assistance, in that respect it should be considered as an independent contractor who has undertaken to operate its machinery when requested by plaintiff's master, and the power given the latter to direct the servants of defendant as to the movement of the bucket was a necessary condition for the proper performance by defendant of its agreement and the superintendent of defendant in following the directions of the servant of plaintiff's master was acting for the defendant in carrying out its agreement.

(*4*)   *Master and Servant.   Fellow Servant.* ·

Where the control of a person other than the general master is one of direction merely as·to result, and not as to the mode or manner of doing the work the servant acting under such control remains the servant of his general master.

(*5*)   *Master and Servant.   Due Care.   Proximate Cause.*

On the above state of facts evidence considered and held to show that plaintiff used reasonable care in the circumstances and that the movement of the bucket by the superintendent of defendant without proper warning to the plaintiff, was the proximate cause of the injury, which the jury was warranted in regarding as negligence.

(*6*)   *Master and Servant.   Assumed Risks.*

Where on the above facts the only danger reasonably to be apprehended by plaintiff from his failure to place a plank in the bucket would be such as might arise from his slipping on the inside of it or from the movement of the jaws caused by the action of the waves, he only assumed the risk of these consequences, and did not assume the risk of the bucket being moved by defendant's servant without warning to him, but had a right to presume that a proper degree of care in that regard would be exercised.

(*7*)   *Master and Servant.*

Whether an act can be regarded as having been done in conformity with an order·previously given will depend upon its relation to the order in point of time and upon the other conditions.

(*8*)   *Master and Servant.   Limited Control.*

Where a servant of defendant was placed under a limited control of plaintiff's master, while defendant might claim freedom from any liability where his

servant had forthwith complied with an order given him by the master of plaintiff, he cannot escape responsibility where his servant waited an hour after the order before complying with it, but in such case the duty rested upon defendant to see that proper warning was given and that the order with safety could be executed, and a jury on such state of facts would be justified in finding that the act was not done in compliance with the order.

TRESPASS ON THE CASE for negligence.   Heard on exceptions of plaintiff and sustained.

SWEETLAND, J.   This is an action of trespass on the case to recover damages for personal injuries alleged to have been sustained by the plaintiff by reason of the negligence of the defendant's servant.

The case was tried before a justice of the Superior Court sitting with a jury.   The jury returned a verdict for the plaintiff for $1,000.   The justice, who presided at the trial, granted the defendant's motion for a new trial.   The case is before us upon the plaintiff's exception to this action of said justice.

It appears from the transcript of the testimony presented in the Superior Court that on July 16th, 1911, the plaintiff was a blacksmith's helper in the employ of Charles Pay & Company, a firm of blacksmiths doing business in Providence; that on said day the plaintiff with other employees of said Pay & Company, by the direction o f their employer, were engaged in repairing for the defendant corporation its iron bucket or mud digger attached to the dredging machinery on its dredger then anchored in the Providence river, off the shore of the town of East Providence.   Said bucket when in use was suspended by heavy chains from the peak of a large oak boom fifty-five feet long; which boom extended obliquely from the deck of the dredger, so that the peak of the boom when raised was over the water and about forty feet above the plane of the deck of the dredger.   This boom was attached to the deck by means of a mechanism having a ball and socket joint; and, under the control of an operator in the pilot house of the dredger, the peak of the

boom might be raised or lowered and the boom might be swung around on the ball and socket joint to the left or the right. The bucket weighed about eight tons and consisted of two iron shells or jaws of equal size, each resembling one-half of a horizontal section of a hollow cylindrical box or drum, cut lengthwise. When the bucket was closed it had the appearance of a horizontal section of such a drum. These two jaws were so hinged together and operated by the dredging machinery that their edges which met at the ends and bottom of the bucket might be separated and brought together again as required, for the purpose of digging mud at the botton of the river, bringing a load above the surface of the water and depositing such load in scows or elsewhere. Before the plaintiff and his fellow workmen began their work the bucket, still attached by chains to said boom, had been placed by the defendant upon a pile of coal on the deck of a scow which was moored alongside the bow of the dredger. The bucket rested upon the bottom edges of its jaws, which bottom edges were a few inches apart. In the course of his work it became necessary for the plaintiff to stand inside the bucket and hold a hot rivet firmly in place while two of his fellow workmen, named, respectively, Coutanche and Donovan, hammered and swaged the head of the rivet upon the outside of the bucket. The inside of the bucket was very smooth. The plaintiff's work required him to press with much force upon the rivet. To assist him in doing so, while standing upon the smooth inside surface of the bucket, the plaintiff placed one foot up on the side of the bucket and the other on or in the opening between the edges of the jaws at the botton of the bucket. While the plaintiff was in this position, the assistant super-intendent of the defendant, known as Captain Smith, in the pilot house of the dredger, by means of the mechanism there controlled, caused the boom to swing, the bucket to be moved, and the jaws of the bucket either to come together or to rub against each other, thus catching and squeezing the plaintiff's foot between the edges of the jaws at the bottom

of the bucket. It is not denied that Captain Smith, when he operated this mechanism, knew that the plaintiff was at work inside the bucket; but it is claimed by the defendant that said Smith was unaware of the exact position and the unprotected condition of the plaintiff's foot. The negligence complained of is the act of said assistant superintendent in thus moving the bucket without warning to the plaintiff.

After the foreman for Charles Pay & Company set his men at work upon said bucket he went away and left the work in charge of one Phillip Coutanche, a blacksmith and fellow workman of the plaintiff. As part of its defence the defendant claims that it was not guilty of negligence because its assistant superintendent, Captain Smith, moved said bucket at the request of Mr. Coutanche. Because of this claim, in addition to its general verdict the jury were directed by the justice presiding to return a special finding upon each of the following issues, settled by said justice:

"1. Did the employee of Charles Pay & Company in charge of the repairs on this bucket order it moved to a perpendicular position?

"2. Was this bucket moved by the employees of the defendant in compliance with a request from the employee of Charles Pay & Company in charge of repairing this bucket?

"3. Was this bucket moved by Captain Smith in compliance with a request from an employee of Charles Pay & Company in charge of repairing the bucket, to enable Charles Pay & Company to make the repairs that they were engaged to perform?"

The jury answered each of these questions in the negative.

The justice presiding bases his decision granting the defendant's motion for a new trial upon the following grounds: 1st, that the uncontradicted testimony tended to show that the defendant's employee, Captain Smith, at the time of the accident, was under the control of Charles Pay & Company and was a fellow servant with the plaintiff; 2nd, "Admitting

that the plaintiff was not notified that the bucket was to be moved," nevertheless the plaintiff should not be permitted to recover in this action, for he was guilty of contributory negligence in working in said bucket without first protecting himself by placing a plank in the bottom of said bucket upon which to stand; and "he must be held to have assumed the risk;" 3rd, that the jury was not warranted in answering in the negative the special question submitted to them by said justice.

We will consider these reasons of said justice in order.

We are of the opinion that Captain Smith, at the time of the accident, was not a fellow servant with the plaintiff. Said justice without doubt rested his decision in this regard upon the fact that while the men of Pay & Company were repairing the bucket, if it became necessary to move the bucket to assist the repair work it would be so moved upon the request or the direction of the foreman in charge of Pay & Company's workmen; and it could be moved only by the employees of the defendant in charge of the dredging machinery. There is also in the transcript the following testimony of the defendant's assistant superintendent, which testimony was corroborated by that of two other witnesses: "We give both captains—we have two captains, give them both strict orders whenever any of Pay's men come down there to work on the bucket or our machinery, give to the captains strict orders to help out all they can, help the work along; they are supposed to do it.  Q. That is in order to expedite the work?  A. Yes.  Q. And Pay's foreman or whoever is in charge can call on your men any time they desire?  A. Yes, sir, we only have a short time to work at our repairs."  These circumstances fall short of making Captain Smith a servant of Pay & Company in operating the bucket while the repairs were being made.  If Captain Smith moved the bucket in response to a direction, negligently given, by Mr. Coutanche, that fact would raise another question as to the defendant's liability, which we will consider later; but in moving the bucket whether that

act was or was not directed by Mr. Coutanche, Captain Smith was not a fellow servant with the plaintiff under the control of Mr. Coutanche.

From the necessities of the situation and by the direction of their general master, the employees of the defendant, operating the dredging machinery while this repair work was being done, were placed under the limited control of Pay & Company.

(2)     Courts have applied a number of tests to the circumstances of different cases for the purpose of determining whether a control of this nature, during the time it is exercised over an employee in the general service of another, effects a transfer of such employee from the service of his general master to that of the person exercising control, making such employee the servant of the latter with the legal consequences of that relation.    Thus, in some cases, it has been regarded as important to consider whether the general master or the one exercising control was the owner or in possession of the property which occasioned a certain injury, or in possession of the instrumentalities with which the work was being performed, or the property upon which the given service was being rendered, and to consider for the benefit of which of these two the work was being done.    In the case at bar, the employment of Captain Smith upon the dredging machinery, while Pay & Company was repairing the bucket, was service performed upon property of the defendant and for the benefit of the defendant.    Any movement of said bucket for the purpose of helping on the work, though primarily made to assist Pay & Company, was really work to expedite the repairs for the benefit of the defendant, whose dredger could not be used for its ordinary purposes while the bucket was being mended; and as Captain Smith testified:    "We only have a short time to work at our repairs."

In some cases, for the purpose of determining which of two persons was the master, courts have considered, as matters of some importance and sometimes apparently as of controlling importance, the source from which the servant in

question received his compensation and as to whether the power of hiring, selection or dismissal was in the general master alone or might be exercised by the person having a temporary or limited control. All these considerations of which we have thus far spoken do not appear to us as being at all conclusive of the main question. They are merely matters of evidence, useful or otherwise, as they tend to throw light upon the ultimate and essential test, which is as to whose is the work which the servant is performing and hence who is really in control of the servant. If it can be satisfactorily determined whose business the servant is doing it is plain whose servant he is, and, in case of the servant's negligence, the principal who must answer. In the person whose affairs are being conducted lies the responsibility and in him is the real control, although for convenience or co-öperation the authority to give general directions or to make suggestions as to the work, to give information, instruction, signals or warnings may be conferred upon another.

(3)    In the case at bar, in the absence of a specific undertaking on the part of the defendant, the operation of the dredging machinery, in which Captain Smith was engaged during the progress of the repair work in question, was work which the defendant was bound to perform in the circumstances of the case. The bucket was very heavy; Pay & Company was without proper appliance to move it; the defendant had control both of the machinery by which it could be moved, and of workmen acquainted with the operation of such machinery. If in the course of the repair work it should become necessary to move the bucket, the defendant was the only one that could do so and it would be obliged to do so if the work was to proceed. The defendant was loaning the work of its machinery and workmen, and not the workmen themselves, for the enterprise in the furtherance of which both Pay & Company and it were jointly interested. However, it was a part of the general arrangement between the defendant and Pay & Company that the defendant would render such assistance, as it could, for the purpose of advanc-

ing the work in question.  It was an essential part of this arrangement that the defendant would move the bucket as might be required.  In that respect the defendant should be considered as an independent contractor who had undertaken to operate its dredging machinery when it might be requested to do so by Pay & Company.  The power given to Pay & Company, to direct the servants of the defendant when to move the bucket, and in what position to place it, was a necessary condition for the proper performance by the defendant of its undertaking with Pay & Company; and Captain Smith in following the directions of the foreman of Pay & Company was acting for the defendant in the performance of the defendant's contract with Pay & Company. The limited control, which we have been considering, was for the convenient dispatch of the duties which Captain Smith and the other employees of the defendant had been deputed to perform in furtherance of the business of the defendant in carrying out its undertaking.

(4)     A consideration of importance in fixing the nature and effect of the control given to a person, other than the general master, is to determine if the control is one of direction merely as to result, or both as to result and the means of its accomplishment.  If the former, the employee acting under such control still remains the servant of his general master. Mr. Labatt, in his work on Master and Servant, says, Vol. 1, 2nd, Ed. p. 56: "The doctrine that a servant is a person who is subject to the control of his employer with respect to the manner in which the details of the work are to be performed involves the corollary that the exercise or non-exercise of control of this character by the person alleged to be a master is the element which must, in the last analysis, always determine what was the essential nature of the relationship between the person who performed the given work, and the person for whom it was performed."  This principle has been recognized in *Higham* v. *Waterman*, 32 R. I. 578, at 584.  In the case at bar the control which the foreman of Pay & Company exercised over the operators of the dredging

machinery went merely to the extent of directing as to the particular movement of the bucket desired by the foreman, to assist him in doing the repair work. It did not amount to control as to the means or the methods by which the men on the dredger should move the bucket. It may fairly be said that the limited control in this case of Pay & Company over the employees of the defendant operating the dredging machinery was as to results and not as to the mode or manner of doing the work. The defendant may wish to urge, in support of the decision of said justice, that the plaintiff's claim is that Captain Smith was negligent in moving the bucket, which we say was a matter in the control of Pay & Company, and that the plaintiff does not claim negligence as to the method employed by Captain Smith in doing so. That circumstance does not affect the question which we are now considering. The defense is that Captain Smith at the time of the accident was the servant of Pay & Company. He does not become such servant in any respect or to any extent, unless Pay & Company had control, not only as to the results which they desired, but also as to the means and methods of producing such results. The relationship of Captain Smith to these two corporations is analogous to that of an employee of a ship or dock owner who is operating hoisting machinery on a ship or dock under the limited control of a master stevedore who, as an independent contractor, is unloading a ship. This relationship has been considered in a number of reported cases. In *Johnson* v. *Navigation Company,* 132 N. Y. 576, the plaintiff was a servant in the employ of a stevedore, who as an independent contractor was engaged by the defendant to unload its vessel. Under its contract with the stevedore the defendant was to furnish the winch for hoisting, the steam power and a man to run the winch. The stevedore had power to direct the winch driver by signal "to hoist or lower, go ahead or come back." The court held that the fact that the winchman acted upon such orders of the stevedore did not operate to make such winchman a servant of the stevedore and a fellow servant

with the plaintiff, who was injured through the winchman's negligence.

Upon facts quite similar to those in *Johnson* v. *Navigation Co., supra,* the United States Supreme Court in *Standard Oil Co.* v. *Anderson,* 212 U. S. 215, held that a winchman remained the servant of his general master, affirming *Standard Oil Co.* v. *Anderson,* 152 Fed.166. See, also, *The Slingsby,* 120 Fed. 748; *The Gladestry,* 128 Fed. 591; *Otis Steel Co.* v. *Wingle,* 152 Fed. 914.

The second ground, on which said justice bases his decision, is his conclusion that the plaintiff was guilty of contributory negligence at the time of the accident. In reaching this conclusion the justice adopts the position of the defendant; that the plaintiff was negligent in not placing a plank in the bottom of the bucket, over the opening between the jaws, before he began his work therein. This precaution it is claimed would have prevented injury to the plaintiff's foot when the bucket was moved. At the trial Mr. Edmonds, the foreman for Pay & Company, testified that as the bucket lay on the deck of the scow "passing boats creating waves will cause those jaws to ride up a little as it leans over that way. While it tries to resume the equilibrium, it rolls till that jaw is a little higher, and it is a continual motion of that jaw, going up and down." This witness further testified that the plaintiff, to protect himself from injury by reason of this movement of the bucket caused by the waves, should have put a plank in the bottom of the bucket; that there were boards and planks on the deck of the scow, not used for other purposes, one of which the plaintiff might have placed in the bucket; and that if the plaintiff had done so his foot would not have been caught when the bucket was moved by Captain Smith. Other witnesses for the defendant testified to the same effect. The plaintiff himself testified that it was not probable that the swell on the water would draw the jaws together and that the waves did not draw the jaws together that day; that the inside surface of the bucket was very smooth, and for the purpose of getting a firm foothold in

doing his work he tried to find, on the deck of the scow, a piece of plank which he might place in the bucket, but was unable to find one which was not too long; and that no one directed him to put a plank in the bucket except a fellow workman named Donovan.  It does not appear in testimony that Donovan suggested that the plaintiff put a plank in the bucket for any purpose except to secure for the plaintiff a firmer footing in doing his work.   While the bucket, lying on the deck of the scow, would rise and fall with the scow, it does not appear probable in the circumstances that there would be any independent movement of the jaws of the bucket caused by the action of the waves, or at most more than a slow and slight independent movement, unless the waters of the river were greatly disturbed.  The bucket weighed about eight tons.  Before commencing work the coal on which the bucket was placed had been shoveled about it to make a level bed on which it should rest, as Mr. Coutanche testified, "so it wouldn't move while we were working on it," and timbers were placed about it to support it securely.   Mr. Coutanche testified as follows as to the stability of the bucket and the reason for putting a plank in the bottom of the bucket:   "138 Q. (By Mr. HEALY.) With Coyne standing in there as Coyne was, and without something at the bottom between the jaws of that digger, he was in danger of getting his foot pinched whenever that digger moved, wasn't he?  A.  Well, if the digger moved he might possibly be caught; if the digger surged over.  But we had it so in a way that we were quite sure she wouldn't surge by the waves of the sea.   139 Q.  Mr. Coutanche, was it a proper precaution to put a board in there?  A.  Well, it is just like this.   Now, he went in there in that digger,— see?—to hold on to a rivet.  It was his place to see that he had a hold on that digger in order to hold his rivet.   140 Q. (By Mr. WILLIAMS.)   That was all the reason why he should see that he had a hold, was so he could hold his rivet?  A. Sure."

Captain Beeton, in the employ of the defendant, as assistant to Captain Smith, testified that before the accident he told the plaintiff to put a plank in the bucket. His testimony in that regard is as follows: "A. I saw him slip— he was helping this rivet-holder and he slipped, and as I was going by, I said, 'Pat, why don't you put a plank in that bucket?' 188 Q. And what did he say? A. Something about he was all right."

(5)    The jury might very properly have found from the testimony, that, under the conditions existing at about the time of the accident, the placing of a plank in the bottom of the bucket would be for the plaintiff's convenience in doing his work, and not something required for his safety, as a precaution against the action of the waves. In any view of the testimony it appears that the only danger reasonably to be apprehended by the plaintiff, from his failure to place a plank in the bucket, would be such as might arise from his slipping on the smooth inside of the bucket or from the movement of the jaws caused by the action of the waves. In accordance with well recognized principle it is the risk of these consequences alone which the plaintiff assumed, when he worked in the bucket without a plank at the bottom. He did not assume the risk of the bucket being moved by Captain

(6)    Smith without warning to him. He had a right to presume that Captain Smith and the other employees of the defendant would exercise a proper degree of care in that regard. The jury was justified in finding that the plaintiff used reasonable care in the circumstances of the case. In no view of the testimony can it be held that any lack of proper vigilance on the part of the plaintiff was the proximate cause of the injury. The movement of the bucket by Captain Smith without proper warning to the plaintiff was an act not reasonably to be anticipated by the plaintiff and against the results of which the plaintiff would not be required to take precaution. That act of Captain Smith was the proximate cause of the injury, and having been done without warning to the plaintiff might properly have been found by

the jury to be negligence.   Said justice does not object to the jury's verdict on the ground that the evidence shows proper warning to have been given to the plaintiff before the bucket was moved.   Although there was testimony to the contrary the jury was warranted in finding that no proper warning had been given.

We will now consider the objection of said justice to the special findings of the jury upon the questions submitted to them.   The defendant claimed at the trial that Captain Smith moved the bucket because of an order to that effect given by Mr. Coutanche and communicated to Captain Smith through Captain Beeton, his assistant.   Mr. Coutanche in answer to questions, testified as follows:   "77 Q.   Did you give orders to hoist?   A.  I did at one time.   Q.  At that time?   A.  Not at that time.   Q.  Now when before that did you give orders for them to hoist, or afterwards? A.  I told them I thought that it would be a good idea if they shook her up so we could get some of the old loose bolts out of the framework.   Q.  How long before that was this? A.  Probably an hour," and later in cross-examination: "100 Q.  And at some time you did give an order to plumb up that frame?   I don't care when.   A.  I did."

Captain Beeton testified that he received a direction from Mr. Coutanche to straighten the bucket; that he communicated this direction to Captain Smith; and that Captain Smith moved the bucket.   Captain Beeton was not asked and did not testify how long it was before the bucket was moved that he received said direction from Mr. Coutanche; and Captain Beeton does not directly contradict the testimony of Mr. Coutanche that such direction was given about an hour before the bucket was moved.   There is no other direct testimony as to the nature of the direction given by Coutanche or as to the time when it was given.   There was testimony, uncontradicted, that, at the time the bucket was moved, Mr. Coutanche was bent over and intent upon his work of fixing the hot rivet in place.   It clearly appears that the movement of the bucket at that time was unexpected and

a surprise to him; for it was inconsistent with the work that he was then doing, it was dangerous to his helper, the plaintiff, inside the bucket, and dangerous to himself outside the bucket and also to his other helper Donovan, who testified that when the bucket was moved he had just time to jump out of the way to guard himself from possible injury. These circumstances, as well as the testimony of Coutanche, would justify the finding that the act of Captain Smith was not done in consequence of a direction by Mr. Coutanche to move the bucket at the exact time that it was moved; and the finding would be warranted by the testimony that the direction of Mr. Coutanche to move the bucket either for the purpose of shaking out the old bolts or to straighten up the frame was given about an hour before the accident.

(7) Whether a certain act can be regarded as having been done in conformity with an order previously given will depend upon its relation to that order in point of time and upon the other conditions. The period of time which elapsed between the order and the act would always be a material circumstance to be considered in the light of the other surrounding facts. An action involving possible dangerous consequences cannot in every instance be regarded as having been taken in obedience to a direction given a long time before, as for example, a direction given an·hour before. In such circumstances reasonable prudence would require that before the act was done inquiry should be made to learn if the direction was still in force or proper warning should be given to all persons whose safety would be affected by the act. Captain Smith and Captain Beeton each testified that he knew it was an improper act to move the bucket while a man was standing in it unless there was a plank in the bottom for the man to stand upon. Captain Beeton at some time before the accident was aware that the plaintiff was at work in the bucket without a plank to stand upon and from the nature of the plaintiff's remark to him it cannot fairly be claimed that Captain Beeton had any reason to believe that the plaintiff intended to put a plank in the bucket or that he had

placed one there before Captain Beeton told Captain Smith to move the bucket.    If when the order was given it had been obeyed forthwith, the defendant, with much force, might claim freedom from liability.    If, however, the defendant's servants waited an hour after the order before they complied with it, until possibly conditions had changed, the requested movement was no longer desired, and all precautions for their safety, on the part of Coutanche and his helpers, had ceased, then the duty was upon the defendant to see that proper warning was given and that the order, with safety could be executed.    If an hour intervened between the order and the act of Captain Smith it cannot be said as a necessary conclusion that the act was done in compliance with the order; and there would be ample warrant for the jury's finding that it was not.    The justice in his decision says that the answer of the jury to the first special question submitted, which question is hereinbefore set forth, was in violation of the instructions of the court.    In his charge the justice directed the jury to answer the first question "whether or not the order was given regardless of the time it was given." The reason for submitting the first question to the jury does not appear on the record.    If it was intended to obtain a finding as to whether the communication from Mr. Coutanche to Captain Beeton was an "order" or a "request" the question should not have been submitted as the effect upon the defendant's liability would be the same whether Captain Smith's action had been in compliance with an "order" or a "request" from Mr. Coutanche.    This question, whatever may have been its purpose, in our opinion, was an immaterial one to submit.    There was no dispute that at some time before the accident an order or request of some nature was given by Mr. Coutanche to the defendant's servants.    The material inquiry in regard to that order or request was whether it should be regarded as a justification for the act of Captain Smith and, as throwing light upon that question, its relation to the act of Captain Smith in point of time. This court in *Reid* v. *Rhode Island Company*, 28 R. I. 321,

at 326, has approved the doctrine that: "It is not any question that the ingenuity or curiosity of counsel, or their desire to mystify or confuse the jury with conundrums of the fact or law, may frame, that is to be submitted to a jury. The question to be submitted must not only be pertinent, but it must be one the answer to which will have some conclusive effect in determining the case, or in solving a material issue in it."

The first question should not have been submitted. The answer of the jury is consistent with their general verdict. We see no reason for granting a new trial because of the jury's finding upon this question; although it is not clear what view the jury took of the question which led them to answer it in the negative. As to the other two special questions, the answers of the jury were amply justified. We do not agree with any of the reasons given by said justice in support of his decision, nor do we find any other reason for disturbing the verdict as to the defendant's liability or as to the amount of the damages.

The plaintiff's exception is sustained.

The case is remitted to the Superior Court with direction to enter judgment upon the verdict.

*James A. Williams,* for plaintiff.

*Frank Healy,* for defendant.